IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BELAIR PRODUCE CO., INC.,

*Plaintiff*,

v.                                                  Civil Action No. ELH-12-299

MIXT GREENS, INC., *et al*.,

*Defendants*.

**MEMORANDUM OPINION**

Belair Produce Co., Inc. ("Belair"), plaintiff, a seller of agricultural produce, has sued

Mixt Greens, Inc. and OM Foods, Ltd. (collectively, "Mixt Greens"), defendants, which own and

operate restaurants, as well as several corporate officers of Mixt Greens, seeking to recover

$74,455.93 in unpaid debts for the sale of produce.  Plaintiff alleges that $60,082.21 of the total

$74,455.93 is owed for the purchase of wholesale quantities of produce.  Therefore, in Count I of

its First Amended Complaint ("Complaint") (ECF 4), Belair alleges that it is entitled to the

benefit of a statutory trust over the proceeds of wholesale produce, created by the Perishable

Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499e(c), in the amount of $60,082.21, *i.e.*,

the sum owed by Mixt Greens for wholesale produce.[1]  Complaint ¶ 14.

---

[1] The Complaint contains six other counts, but Count I is the only count that is currently
at issue.  Count II, asserted against all defendants, alleges "failure to pay for goods sold" in the
total amount of $74,455.93 owed to Belair.  Complaint ¶ 16.  Counts III, IV, V, and VI allege the
"unlawful dissipation of trust assets by a corporate official" against defendants Richard Servera,
Michael Gats, Dean Leisman, and Wolfgang Reichenberger, respectively, all of whom are
alleged to be corporate officers of Mixt Greens.  Complaint ¶ 23, 28, 33, 38.  An Order (ECF 21)
has been issued staying service of process as to Mr. Servera, Mr. Leisman, and Mr.
Reichenberger.  Count IV, lodged against Michael Gats, has been voluntarily dismissed (ECF
18).  Count VII seeks interest and attorneys' fees.  Complaint ¶ 43.          (*cont'd next page*)

Mixt Greens has filed a "Motion to Dismiss Count I of the Complaint" ("Motion") (ECF 12), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Additionally, Mixt Greens filed a "Request for Judicial Notice in Support of a Motion to Dismiss Complaint" ("Request") (ECF 17), in which it contends that the court should take judicial notice of and/or consider additional documents that were not submitted with the Complaint. Belair has filed a "Response in Opposition to Defendant's Motion to Dismiss and Request for Judicial Notice" ("Response") (ECF 19), and Mixt Greens has filed a Reply (ECF 22).

No hearing is necessary to resolve the issues presented. *See* Local Rule 105.6. For the reasons that follow, I will grant the Motion.

### Factual Background[2]

On June 12, 2011, Mixt Greens submitted credit applications to Belair for each of its three restaurant locations, on a form on Belair's letterhead. *See* Ex.A to Request (ECF 17-1). The credit applications offered the prospective customer a choice of "Credit Terms Requested": "COD," "Credit Card," or "7, 14, 21, or 30 day." *Id.* In each application, Mixt Greens circled "30."

According to the Complaint, during a three-month period between September 12, 2011 and December 5, 2011, Belair sold and delivered to Mixt Greens $74,455.93 worth of goods and produce, of which $60,081.21 was for wholesale quantities of produce. Complaint ¶ 7. Mixt

---

(*footnote cont'd*)

The Court has jurisdiction over this dispute according to 7 U.S.C. § 499e(c)(5), which states that "the several district courts of the United States are vested with jurisdiction specifically to entertain . . . actions by trust beneficiaries to enforce payment from the trust." The Court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

[2] For the purpose of the Motion, the parties are in agreement as to the pertinent facts. *See* Response at 13; Reply at 2.

Greens accepted the goods and produce, which were accompanied by invoices from Belair.  *Id.* ¶¶ 7-8, 10.  Mixt Greens has submitted copies of purchase orders, sent by Mixt Greens to Belair on June 26, 2011 and September 11, 2011, respectively, both of which state "NET30" as the "Payment Terms."  *See* Ex. B & D to Request (ECF 17-2 & 17-4).  It has also submitted Belair's acceptances, via email, of each of the purchase orders.  *See* Ex.C & E to Request (ECF 17-3 & 17-5).[3]  Although Mixt Greens has submitted only two of the purchase orders between the parties, over 100 such purchase orders were transmitted by Mixt Greens and fulfilled by Belair.

According to Belair, the entire balance of $74,455.93 remains unpaid by Mixt Greens. Complaint ¶ 7.  Belair further asserts that $60,081.21 worth of wholesale produce is subject to trust protection under the PACA.  Belair claims it became a beneficiary of the PACA trust once Mixt Greens received the produce.  *Id.* ¶ 9.  Moreover, Belair claims that its interest in the trust was preserved by including on invoices that were sent to Mixt Greens the form language that is required by 7 U.S.C. § 499e(c)(4) in order to impose PACA trust protection.  *Id.* ¶ 10.[4]  As an example, Belair included as an attachment to its Complaint an invoice to Mixt Greens, dated September 12, 2011, which has the requisite statutory language printed on the bottom left of each page.  *See* Ex.2 to Complaint (ECF 4-2).  In addition, in small print at the top right of each page of the invoice, the invoice includes the language "payment due by 10th of the following month." *Id.*  The parties sometimes refer to this as a "10 Day EOM" payment term (*i.e.*, 10 days after the E̲nd O̲f M̲onth).  Motion at 7.

---

[3] As I shall explain, consideration of the documents submitted by Mixt Greens is authorized by Rule 12(d) of the Federal Rules of Civil Procedure.

[4] The language that the statute requires is set forth, *infra*.

Mixt Greens closed its Maryland and Washington, D.C. restaurant locations on or about December 9, 2011. *Id.* ¶ 10. Belair alleges that Mixt Greens' failure to pay the balance due to Belair, along with the closing of its restaurants, demonstrates that Mixt Greens "is failing to maintain sufficient assets in the statutory trust to pay Plaintiff and [is] dissipating trust assets." *Id.* ¶ 12.

## Discussion

## A.  Standard of Review

In considering a motion to dismiss under Rule 12(b)(6), a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court has discretion to consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2012 Supp.). This discretion "should be exercised with great caution and attention to the

parties' procedural rights."  *Id.* at 149.  In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.* at 165-67.

Here, both sides agree that the Court may convert the Motion to one for summary judgment and consider the additional documents under Fed. R. Civ. P. 12(d).  *See* Response at 12; Reply at 2.  Accordingly, I will exercise my discretion under Rule 12(d) and consider the Motion under a summary judgment standard.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides that "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

In resolving such a motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). However, "[t]he party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original)

(quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  Moreover, the court must abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## B.  The PACA

Congress enacted the PACA in 1930 to promote fair trading practices in the produce industry.  *See Idahoan Fresh v. Advantage Produce, Inc.*, 157 F.3d 197, 199 (3rd Cir. 1998).  In particular, Congress intended the PACA to protect small farmers and produce growers who were vulnerable to the practices of financially irresponsible merchants, dealers, or brokers.  *See id*. The sale of perishable agricultural commodities, constituting produce such as fresh fruits and vegetables, are subject to the PACA.  *See* 7 U.S.C. § 499a(b)(4).   In 1984, Congress amended the PACA and created a statutory trust meant to protect unpaid sellers.  *See* 7 U.S.C. § 499e(c); *see also Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361, 364-65 (6th Cir. 2003).

The PACA establishes a floating trust over proceeds from the sale of produce received by a "merchant, dealer, or broker,"[5] which must be held "for the benefit of all unpaid suppliers or

---

[5] With some exceptions, the PACA defines a "dealer" as "any person engaged in the business of buying or selling . . . any perishable agricultural commodity in interstate or foreign commerce," in "wholesale or jobbing quantities."  7 U.S.C. § 499a(b)(6).  However, "no person buying any such commodity solely for sale at retail shall be considered as a 'dealer' until the invoice cost of his purchases of perishable agricultural commodities in any calendar year are in excess of $230,000."  *Id.*

Courts have held that "a restaurant that buys the requisite quantities of perishable agricultural commodities as part of its business is a 'dealer' even if the commodities are used only in the commercial preparation of meals instead of being resold in unprocessed form." *Royal Foods Co. Inc. v. RJR Holdings Inc.*, 252 F.3d 1102,1107 (9th Cir. 2001); *accord In re Old Fashioned Enters., Inc.*, 236 F.3d 422, 425 (8th Cir. 2001); *In re Magic Rests., Inc.*, 205 F.3d

sellers" who sold the produce to the dealer, until full payment has been made to the sellers. *Id.* § 499e(c)(2). The PACA trust creates a "superpriority" right to reimbursement from the proceeds of the produce, which "trumps the rights of the buyer's other secured and unsecured creditors." *Bocchi Am. Assocs., Inc. v. Commerce Fresh Mktg., Inc.*, 515 F.3d 383, 388 (5th Cir. 2008). "In return for its protections, PACA establishes strict eligibility requirements." *Patterson Frozen Foods, Inc. v. Crown Foods Int'l, Inc.*, 307 F.3d 666, 669 (7th Cir. 2002).

In order to gain entitlement to the benefits of the trust, a seller must give a dealer certain written notices stating the seller's intent to preserve its trust rights. *See id.* § 499e(c)(3). A seller can preserve rights to the PACA trust by including the following statutorily required language on the face of its individual "ordinary and usual billing or invoice statements":

> "The perishable agricultural commodities listed on this invoice are sold subject to statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."

7 U.S.C. § 499e(c)(4).[6]

Under the PACA, the Secretary of Agriculture is authorized to establish a default payment term for transactions subject to the PACA trust. *See id.* § 499e(c)(3) (authorizing the "Secretary" to establish default payment term); *see also id.* § 499a(b)(2) (providing that

---

108, 114-15 (3d Cir. 2000), *cert. denied*, 531 U.S. 818 (2000). The Complaint does not contain an allegation as to the total annual dollar amount of produce purchased by Mixt Greens. However, Mixt Greens does not dispute in its Motion that it is a dealer for PACA purposes.

[6] In the alternative, a seller can also preserve rights to the PACA trust by giving a written notice of the seller's intent to preserve the benefits of the trust to the dealer within 30 days after expiration of the time for payment or within 30 days after the seller receives notice that the dealer's payment method has been dishonored. *See* 7 U.S.C. § 499e(c)(3). However, this method of preserving the PACA trust is not at issue here.

"Secretary" means the Secretary of Agriculture).   Pursuant to that authority, in the Code of

Federal Regulations the Secretary has established a default payment time period of "10 days after

the day on which the produce is accepted."   7 C.F.R. § 46.2(aa)(5).   According to the PACA,

however, the default payment terms established by the Secretary can be amended by agreement

between a seller and a dealer if certain procedures are followed.   *See* 7 U.S.C. § 499e(c)(3).

"When the parties expressly agree to a payment time period different from that established by the

Secretary, a copy of any such agreement shall be filed in the records of each party to the

transaction and the terms of payment shall be disclosed on invoices, accountings, and other

documents relating to the transaction."   *Id.*; *see In re San Joaquin Food Serv., Inc.*, 958 F.2d 938,

940 (9th Cir. 1992) ("The clear command of this statutory language is that a failure to include

payment terms in invoices divests the seller of trust benefits.").   Furthermore, the different

payment time period must be one that the "parties have expressly agreed to in writing before

entering into the [produce] transaction." 7 U.S.C. § 499e(c)(3).

> If the parties elect to change the payment time period from the default payment time, the

Secretary has provided by regulation that "the maximum time for payment for a shipment to

which a seller, supplier, or agent can agree, prior to the transaction, and still be eligible for

benefits under the trust is 30 days after receipt and acceptance of the commodities . . . ."   7

C.F.R. § 46.46(e)(2).   "[I]f a seller of produce agrees to extend the time for payment more than

thirty days following delivery and acceptance of the produce, the seller may no longer assert any

right to a PACA trust or seek recovery from a principal of the buyer."   *Bocchi*, 515 F.3d at 388;

*accord Am. Banana Co. v. Republic Nat'l Bank of N.Y., N.A.*, 362 F.3d 33, 45 (2d Cir. 2004)

("Sellers who are willing and able to enter into such agreements [for a payment period beyond

thirty days] . . . neither need nor deserve the elevated priority they receive under PACA's trust protection."); *Patterson Frozen Foods*, *supra*, 307 F.3d at 669; *Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 891 (7th Cir. 1999).[7]

Mixt Greens argues that Belair lost the protection of the PACA trust for two reasons. First, the parties selected an amended payment time period of 30 days, but Belair failed to accurately reflect the amended payment term on the invoices, instead reflecting the 10 Day EOM term. Second, Mixt Greens contends that the 10 Day EOM payment time period reflected on the invoices exceeds the maximum 30-day payment time period allowed under the PACA. I will consider each argument in turn.

With respect to its first argument, Mixt Greens maintains that both the credit applications and the combination of purchase orders and email acceptances amounted to written agreements that amended the default payment time period and were entered into before the transactions. Motion at 6. Because the payment time period was amended, Belair was required to reflect the new 30-day term on each invoice in order to retain PACA trust protection. *See* 7 U.S.C. § 499e(c)(3). And, because Belair instead provided a 10 Day EOM term on its invoices, rather than the agreed 30-day term, Mixt Greens argues that Belair violated the terms of 7 U.S.C.

_____

[7] In *Bocchi*, the Fifth Circuit observed that, "[i]n enacting the PACA statute, Congress sought to provide trust protections only to sellers extending short-term credit to buyers," 515 F.3d at 390, and explained the underlying rationale for this limitation, *id.* at 390 n.5:

> [C]ontrary to PACA's purpose, allowing a PACA trust-protected seller to receive payments beyond thirty days while retaining its trust protections would . . . increase uncertainty in the agriculture market. A buyer's other secured and unsecured creditors would face the possibility of a seller asserting its PACA trust superpriority rights far into the future. In the meantime, those creditors would see the PACA-protected seller extracting preferential payments from the already-delinquent buyer.

§ 499e(c)(3), which require disclosure of the amended time periods on all documents related to the transaction.  *See id.*

Belair counters that the credit applications were merely "request[s] for an offer" and not contracts.  Response at 8.  It maintains that the purchase orders and email acceptances did not form a written agreement to alter the default payment time period because the parties did not "bargain for" the 30-day term.  Moreover, Belair adds that the default time period was not altered because both documents were a part of the transaction, and thus were not created "before entering into the [produce] transaction," as required by 7 U.S.C § 499e(c)(3).  Response at 8. Further, Belair reasons that, because there was no written agreement pre-dating the transaction that altered the default payment time period, the 10 Day EOM payment term listed on its invoices is "irrelevant" and should be disregarded.  Response at 7.  Thus, in Belair's view, the payment term was at all times the default 10-days-after-acceptance payment term promulgated by the Secretary of Agriculture, and Belair is entitled to the protection of the PACA trust.

Precedent indicates that both the credit applications and the purchase orders with their acceptances were sufficient to establish a written agreement to amend the payment terms.  Under the PACA, a formal, integrated contract is not necessary to satisfy the requirement that the parties agree to the amended payment time period in writing.  Rather, "a PACA trust can be created through letters, invoices, or anything else reduced to writing with no requirement of formality."  *Patterson Frozen Foods*, *supra*, 307 F.3d at 671.  In *Patterson Frozen Foods*, the Seventh Circuit held that signed letters and faxes complied with the Statute of Frauds and satisfied the writing requirement in a PACA case.  *Id.* at 671.

*In re Ebro Foods, Inc.*, 449 B.R. 759 (N.D. Ill. 2010) is also salient.  The *Ebro* Court stated: "Because Ebro's purchase orders were signed by both parties and set forth all material terms—quantity, price, delivery date, and a thirty-day payment term—they plainly satisfy the statute of frauds and thus qualify as an express agreement under PACA."  *Id.* at 765-766.  In *Ebro*, although the seller agreed in writing to a 30-day payment term, it stated "PACA Terms (meaning 10 days)" on its invoices.  *Id.* at 763.  The *Ebro* Court held that, due to this misstatement of the payment terms, the seller failed to preserve its PACA trust rights.  *Id.*

Belair's argument that the purchase orders and acceptances were not entered into "before entering into the transaction," as required by the PACA, *see* 7 U.S.C. § 499e(c)(3), is not persuasive.  For the purpose of compliance with the pre-transaction requirement of § 499e(c)(3), courts have held that the "transaction" begins with the shipment or delivery of goods, not with the agreement to ship the produce.  *See Ebro*, 449 B.R. at 765-766 ("[D]elivery rather than contract formation is the 'transaction' that cuts off the time for extended payment terms."); *In re Richmond Produce Co., Inc.*, 112 B.R. 364, 374 (N.D. Cal. 1990) ("[T]he letters at issue were furnished well prior to delivery of the produce, and thus preceded the sale transaction as required by 7 U.S.C. § 499e(c)(3).").  Because the credit agreements and the purchase orders and acceptances were transmitted before delivery of the produce to Mixt Greens, the agreement for amended payment terms that the documents memorialize preceded the produce transaction.

In sum, I agree with Mixt Greens that the parties agreed in writing, before the transaction, to a payment term other than the default 10-days-after-acceptance term promulgated by the Secretary of Agriculture.  Accordingly, Belair was required to state the amended term on its

invoices.  Because Belair failed to do so (instead providing the 10 Day EOM term), it lost the protection of the PACA trust.  *See In re San Joaquin Food Serv., Inc.*, *supra*, 958 F.2d at 940.

Moreover, even if there had not been an agreement to a different payment term, I agree with Mixt Greens' second contention: the inclusion on the invoices of the 10 Day EOM term, by itself, violated the PACA and deprived Belair of trust protection.

Mixt Greens cites *Overton Distributors, Inc. v. Heritage Bank*, 340 F.3d 361 (6th Cir. 2003), in support of its position.  In *Overton*, a produce seller unilaterally changed a previous amended payment term of 25 days to a 10 Day EOM payment term, and reflected this change on its invoices.  *See id.* at 366.  The *Overton* Court found that the 10 Day EOM payment term exceeded the PACA maximum 30-day payment period "[b]ecause payments for produce delivered on the first of the month could be made as late as 40 days after the date of acceptance." *Id.*  Accordingly, the *Overton* Court held that the seller was not entitled to PACA trust protection.  *Id.* at 368.

In an attempt to distinguish *Overton*, Belair points to the existence of a signed agreement in *Overton* that was entered into by the parties before the transaction, which amended the payment terms, and claims that a similar agreement does not exist here.  Response at 9.  As already discussed, I disagree with Belair that a written agreement to alter the payment terms did not exist.  As I see it, *Overton* is entirely on all fours with this case.

Regardless of whether a prior written agreement to alter the payment terms existed, it is clear that a 10 Day EOM term is inconsistent with the PACA.  A 10 Day EOM term, which requires payment by the tenth day of the month following the month in which the produce is accepted, will extend beyond the 30-day-post-acceptance maximum whenever produce is

delivered in the first ten days of a month.  As the *Overton* Court observed, if the produce is delivered on the first day of a given month, payment on a 10 Day EOM term will not be due until the tenth day of the next month, potentially up to 41 days later.

Belair, however, claims that the inclusion on the invoices of the 10 Day EOM term is legally irrelevant.  In support of its position, Belair relies on a single case: *In re Atlanta Egg & Produce, Inc*., 321 B.R. 746 (N.D. Ga. 2005).  There, "because there was no agreement—oral or written—to extend the payment terms beyond the standard 10 days," the court held that "the listing of payment terms other than 10 days had no legal relevance." *Id*.  at 755.  However, *Atlanta Egg* is distinguishable from this case because the payment terms in *Atlanta Egg* never exceeded the maximum payment term of 30 days.  *See id*. at 754.  Indeed, this point was critical to the *Atlanta Egg* Court's conclusion.  It stated, *id*. at 755 (emphasis added):

> No provision of the statute or regulations disqualifies a seller from PACA trust benefits simply because the seller unilaterally changed the payment term on the invoice to a period other than the standard 10-day period, *but in no circumstance greater than 30 days*.  These sellers satisfied the notice requirement by including the requisite language on the face of their invoices to Atlanta Egg, see 7 U.S.C. § 499e(c)(4), *and the payment period on the invoices did not exceed thirty days*.

In contrast, the 10 Day EOM term here exceeded the 30-day maximum allowable under the PACA.  In this case, the fact that Belair unilaterally changed the payment time period to 10 Day EOM is fatal to its argument that the unilaterally amended payment term has no legal significance, because the payment term itself violated the PACA regulations.

The enforcement of the 30-day payment time period maximum is central to the purpose of PACA.  The *Overton* Court stated: "Congress' purpose in enacting PACA was to protect sellers delivering their produce on essentially cash terms, not to provide protection to sellers who

are willing to extend payment terms beyond the statutory maximum."  *Overton*, 340 F.3d at 367

(citing *Hiller Cranberry Prods., Inc. v. Koplovsky*, 165 F.3d 1, 12 (1st Cir. 1999)).

In conclusion, Belair has not preserved its PACA trust protection.  The parties entered

into a written agreement before the transaction, which amended the payment time period from

the default 10 days to 30 days, as reflected in the purchase orders.  The inclusion of the 10 Day

EOM payment time period on the invoices violated the PACA requirement that amended terms

of payment be reflected on invoices, accountings, and other documents relating to the

transaction, as outlined in 7 U.S.C. § 499e(c)(3).  Furthermore, the 10 Day EOM payment time

period listed on the invoices violated the PACA requirements under 7 C.F.R. § 46.2(aa)(5), i.e.,

that no payment time period exceed 30 days.

For the foregoing reasons, I will grant summary judgment to defendants as to Count I.

Moreover, as I see it, defendants' success as to Count I calls into question the viability of

Belair's remaining claims and the propriety of their resolution by this Court.  The claims against

the individual defendants appear to be predicated upon the notion that Belair is entitled to PACA

trust protection.  But, where a seller has failed to perfect its PACA trust entitlement, "the seller

may no longer assert any right to a PACA trust *or seek recovery from a principal of the buyer*."

*Bocchi*, *supra*, 515 F.3d at 388 (emphasis added).  Moreover, although Count II is labeled as a

claim for "failure to pay for goods sold," and does not expressly invoke a particular source of

legal duty, it appears to state a claim under state law for breach of contract and/or unjust

enrichment.

Yet, it is uncertain whether this Court can or should exercise jurisdiction over a state law

claim in this case.  Plaintiff has not asserted subject matter jurisdiction on the basis of diversity

of citizenship, *see* 28 U.S.C. § 1332(a), and it is not clear that the requirements of that statute are satisfied.  Notably, the state citizenship of the parties is not fully articulated in the Complaint, and plaintiffs have only sought to recover $74,455.93, which is below the $75,000 amount-in-controversy threshold for invocation of diversity jurisdiction.  To be sure, when subject matter jurisdiction is based on a federal question, the Court has supplemental jurisdiction over related state law claims.  *See* 28 U.S.C. § 1367(a).  But, when all of the federal claims over which the Court has original jurisdiction have been dismissed, as may well be the case here, it is discretionary with the Court whether to retain jurisdiction over state law claims within the Court's supplemental jurisdiction.  *See* 28 U.S.C. § 1367(c).

Because the parties have not addressed the foregoing issues, in the Order that follows, I will direct them to brief the Court as to (a) whether any viable federal claims remain against any defendants, including the claims against the individual defendants; (b) whether diversity jurisdiction is satisfied; and (c) if no viable federal claims remain and diversity is not satisfied, whether the Court should retain supplemental jurisdiction over plaintiff's state law claims.

Date:  October 18, 2012                                      _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge